IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Jay Caracci, on behalf of himself and all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 19 C 2796 |
| | ) | (Consolidated action) |
| | ) | |
| American Honda Motor Company, Inc., | ) ) | |
| | ) | |
| Defendant. | ) | |

<u>Memorandum Opinion and Order</u>

Chicago has a rat problem. Indeed, it has been named the Rattiest City in America every year for the past nine years.[1] The city's impressive rodent population makes itself known to Chicagoans in a variety of ways, ranging from the distasteful—such as when rats scurry down alleys, around garbage bins, or across the sidewalk—to the destructive,[2] to the downright weird.[3] Rodents

---

[1] *See Oh Rats! Chicago Tops Orkin's Rattiest Cities List for Ninth Consecutive Year*, at https://www.orkin.com/press-room/top-rodent-infested-cities-2023 (last accessed March 11, 2024).
[2] Researchers from the Lincoln Park Zoo's Chicago Rat Project note that "[r]ats can damage property by chewing pipes and wires." *See* https://www.lpzoo.org/science-project/the-chicago-rat-project/. *See also* Sackman Report, ECF 174-51 at 6 ("Claims reported for U.S. insurance companies as far back as the 1950's estimated that about 25% of house fires due to undetermined causes are in fact the result of rodent damage to wiring.").

have long been known to gnaw on a variety of industrial materials, including "telephone cables, wiring, plastic pipes, rubber, lead and even steel," Sackman Report, ECF 174-51 at 6, and national newspapers have reported that "[r]odents have long ravaged automobiles[.]"[4] In November of 2023, ABC News Chicago confirmed that "[r]ats feasting on your car's wires is a common problem in Chicago."[5]

The present law suit seeks to hold the American Honda Motor Company ("Honda") responsible for failing to inform three Chicagoland customers and a putative class of consumers that their vehicles were susceptible to rodent damage that could cause serious vehicle malfunctions. The action also challenges Honda's failure either to repair such damage under the terms of Honda's New Vehicle Limited Warranty ("NVLW") or to alert consumers *ex ante* that such damage would not be covered by that warranty. A

---

[3] *See* Emily Schmall, Jan. 13, 2024, *Chicago's Latest Attraction? A Rat-Shaped Hole*, N. Y. TIMES, https://www.nytimes.com/2024/01/13/us/chicago-rat-hole.html. A photograph of the hole as published in a tweet by Chicago-based comedian and writer Winslow Dumaine, is reproduced here:



[4] Ginger Adams Otis, Jan. 12, 2024, *A New York Professor Wages Epic Battle Against Rats Attacking His Car*, WALL STREET JOURNAL, A New York Professor Wages Epic Battle Against Rats Attacking His Car - WSJ

[5] Jason Knowles and Ann Pistone, Chicago rats chew through car wires, make nests under hoods; what you can do," ABC 7, Nov. 11, 2023, https://abc7chicago.com/how-many-rats-are-in-chicago-car-wires-chewed-by-rat-baby/14040672/.

summary of plaintiffs' allegations and the proceedings to date follows:

After rodents gnawed the electrical wiring of his 2015 Honda Accord, causing its power steering to malfunction, Michael Preston filed a putative class action challenging Honda's "decision to switch to soy-based insulation to cover the subject vehicles' electrical wiring" in an effort to be "more environmentally friendly[.]" Compl., *Preston v. American Honda Co.*, No. 22 C 1777 (N.D. Ill.) ("*Preston*"), ECF 1 at ¶ 2. Preston alleged that Honda's "use of soy-based material to cover electrical wiring rendered the wiring particularly susceptible to being sought out, chewed and/or eaten by rodents and other animals," and thus "defective" in material and/or workmanship. *Id.* at ¶¶ 17, 1. Mr. Preston claimed that Honda's failure to disclose his vehicle's "soy-based wiring defect," and its failure to disclose that damage resulting from this defect would not be covered by the NVLW violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* Mr. Preston also alleged that Honda's failure to cover the rodent damage to his vehicle under the NVLW—which promises to "repair or replace any part that is defective in material or workmanship under normal use"—breached Honda's express warranty, as well as its implied warranty that Preston's vehicle was fit for use. Preston Compl., ECF 1.

3

In a First Amended Complaint, Penelope Turgeon, whose 2017 Honda Civic twice malfunctioned due to successive incidents of rodent damage to its electrical wiring, joined Mr. Preston as a named plaintiff. The First Amended Complaint in *Preston* omitted Mr. Preston's breach of warranty claims and asserted only a claim under the ICFA. That complaint, which was then pending before another judge of this district, was transferred to the Central District of California, where similar cases against Honda had been filed. It was then dismissed by the California court for failure to state a claim; and while the Ninth Circuit affirmed dismissal, it remanded to allow plaintiffs to amend their complaint. *Preston v. Am. Honda Motor Co., Inc.*, 783 F. App'x 669, 670 (9th Cir. 2019). The Central District of California then transferred the action back to this district. By that time, plaintiff Jay Caracci had filed a separate action in this district after rodents chewed through the wiring of his 2015 Honda CR-V.[6] Mr. Caracci alleged that "the soy or bio-based materials used in vehicle manufacturing today...are increasingly more vulnerable to rodent attacks," and he claimed that Honda's failure to disclose "the defective nature of these materials" used in his vehicle, or to cover repairs

---

[6] As I noted in my order denying Honda's motion to transfer this case to the Central District of California, ECF 29, the judge of that district, whose familiarity with similar cases prompted Judge Leinenweber to transfer *Preston*, had since died, undermining the argument that judicial resources would be conserved by transferring Mr. Caracci's case to that district.

necessitated by rodent damage under the NVLW, violated the ICFA and breached Honda's express and implied warranties. First Am. Compl., ECF 1-1 at ¶¶ 2, 37. I consolidated the *Preston* and *Caracci* actions and allowed plaintiffs to file the now-operative Second Amended Complaint ("SAC").

The SAC alleges, on behalf of the individuals named above and a putative class of Illinois consumers, that Honda violated the ICFA by: concealing known defects in their vehicles' wire harnesses that made them especially vulnerable to rodent damage; failing to warrant repairs necessitated by such damage under the NVLW; and failing to warn consumers that rodent damage posed significant safety hazards. The SAC also claims that Honda breached its implied warranty of merchantability and fitness for ordinary purpose by selling cars that "include wiring that acts as food for rodents" and then failing to repair or replace the damaged wiring and component parts. Finally, it claims that Honda breached its express warranty to "repair or replace any part that is defective in material or workmanship under normal use." Honda has moved for summary judgment of the individual plaintiffs' claims and to exclude the testimony of plaintiffs' experts. Plaintiffs have moved for class certification. For the reasons explained below, I grant Honda's summary judgment motion, rendering the remaining motions moot.

I.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This can be done in one of two ways: the movant can present evidence affirmatively negating an essential element of the nonmovant's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or where, as here, the non-movant bears the underlying burden of persuasion, the movant can point out "that there is an absence of evidence to support the nonmoving party's case." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (quoting *Celotex* 477 U.S. at 325). If the movant carries its initial burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Wiegel v. Stork Craft Mfg., Inc.*, 946 F. Supp. 2d 804, 808 (N.D. Ill. 2013) (quoting Fed. R. Civ. P. 56(e)). This means that the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the non-movant must substantiate its facts with evidence. Although the record "must be

6

viewed in the light most favorable to the nonmovant," *Anderson* v. *Liberty Lobby*, 477 U.S. 242, 255 (1986), "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).

To prevail on an ICFA claim based on deceptive conduct, a plaintiff must show: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 922 N. E. 2d 309, 313 (2009). To prevail on the unfairness prong of ICFA, plaintiffs must point to evidence suggesting that the conduct they challenge (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; (3) causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (2002).

## II.

Honda's lead argument is that it is entitled to summary judgment because plaintiffs have uncovered no evidence of the putative "defect" that is the cornerstone of their claims. Plaintiffs are quick to point out, in response, that "this is not a design choice case but a fraud by omission case," and that "they

7

seek redress for [Honda's] specific knowledge of the wiring vulnerability and its refusal to employ countermeasures, cover under warranty, or warn." SJ Opp., ECF 190, at 3 and n. 3. But each of these theories is fundamentally rooted in the idea that the wiring in the engine compartment of their vehicles was "defective" because the material used to insulate it "attracts rodents or other animals," increasing the likelihood that such animals will chew on the wires and cause the vehicles to malfunction. So while plaintiffs may be correct that they need not establish each element of a design defect claim under the law of strict products liability to prevail on their ICFA claim, they must nevertheless offer *something* to show that the wiring in their vehicles was inferior, in some ascertainable way, from other, "non-defective" wiring available on the market. Otherwise, their claim is based on nothing more than the age-old problem of rodents gnawing on and damaging various types of materials—a claim that Judge Real appropriately rejected. *Preston*, 2018 WL 5099507, at *2 (C.D. Cal. May 24, 2018), *aff'd in part, rev'd in part on other grounds and remanded*, 783 F. App'x 669 (9th Cir. 2019) (rejecting plaintiffs' theory that "the damaged wires themselves are defective simply because rodents enjoy chewing on them, even if the wires do not attract rodents.").

In their original complaints, plaintiffs zeroed in on Honda's "decision to switch to soy-based insulation to cover the subject

8

vehicles' electrical wiring," which they claimed increased their cars' vulnerability to rodent attacks. *See Preston* Compl., No. 22 C 1777, ECF 1, at 1-2 ("the soy content of the coating attracts rodents and other animals, causing them to eat away at the wire coating."; *Caracci* First Am. Compl., ECF 1-1 at ¶ 2 ("while the soy or bio-based materials used in vehicle manufacturing today may be allegedly more eco-friendly...they are increasingly more vulnerable to rodent attacks."). And while the SAC places less emphasis on Honda's alleged "switch" to soy-based materials, asserting more broadly that "wiring defects" made their vehicles especially susceptible to rodent attacks, the only specific defect the SAC identifies is the use of "epoxidized soybean oil and other bio-based parts" in the wiring insulation in plaintiffs' vehicles. *See*, e.g., SAC at ¶ 42 (alleging "defective nature of these materials"); *id.* at ¶53 (Honda impliedly represented that its vehicles contained "non-defective component materials...that would not be easily susceptible to rodent damage"); *id.* at ¶ 62 (rodent damage allegedly caused by a "failure in Honda's product materials"). *See also id.* at ¶ 55 (plaintiffs' vehicles allegedly unfit for intended purpose because "they include wiring that acts as food for rodents").

Ultimately, however, plaintiffs failed to uncover any evidence that "epoxidized soybean oil," or indeed any "bio-based" material, was used in the parts of their vehicles that suffered

rodent damage. *See* Pl.'s L.R. 56.1 Resp., ECF 191 at ¶¶ 103, 105, 107. Plaintiffs insist that Honda's evidence does not "conclusively refute[]"that such materials were used, but that is insufficient to withstand summary judgment. *See Matsushita*, 475 U.S. at 586. At all events, even assuming that the damaged parts of plaintiffs' vehicles contained soy-based materials, plaintiffs do not controvert Honda's evidence of a recent study concluding that "[t]he inclusion of soybean oil or its derivatives in common elastomers [does] not affect rodent gnawing." Def.'s L.R. 56.1 Stmt., ECF 174-1, at ¶ 108.[7] Accordingly, plaintiffs are not entitled to a trial on any theory grounded in the claim that their vehicles were "defective" because they contained wires insulated with soy or bio-based materials. This includes the theories that Honda violated the ICFA by failing to disclose the presence of soy or bio-based material in the wiring harnesses of plaintiffs' vehicles; by failing to take "countermeasures" to offset the allegedly heightened vulnerability of such wiring to rodent damage; or by failing to inform them that damages allegedly caused by this defect would not be covered under the NVLW.

---

[7] Plaintiffs do not dispute that this finding was reported in a study Honda cites, but they assert without evidentiary citation that "financial and material support" for the study "was provided by the United Soybean Board." This statement is presumably intended to cast doubt on the study's findings, but in the absence of any contrary evidence or support for plaintiffs' speculation, their bald assertion does not raise a triable factual dispute.

Unable to substantiate their original theory that the presence of soy-based materials in their vehicles caused the injuries asserted in the SAC, plaintiffs insist that their claims "do not rely on the presence or absence of a particular ingredient in the wiring harness components," SJ Opp., ECF 190 at 4, and that summary judgment is unwarranted based on evidence that "some types of wiring insulation are more attractive to rodents than others, but what matters is access and the inability of the insulation to withstand gnawing without rodent deterrent measures in place," *id*. at 2. But no reasonable jury could find in plaintiffs' favor on such evidence. To begin, plaintiffs' assertion that "some types" of wiring are particularly attractive to rodents reads a lot like a tacit admission that they have no evidence that the type of wiring found *in their vehicles* was especially attractive to rodents. Moreover, they acknowledge that "like any other vehicle with an internal combustion engine," their vehicles "cannot be sealed against rodent intrusion without compromising the need for heat dissipation from the engine and suspension travel," Pl.'s L.R. 56.1 Resp., ECF 191, at ¶ 121, and, indeed, they have never claimed that their vehicles' wiring was particularly accessible to rodents, or that this accessibility caused the injuries they claim. Finally, to the extent their claim is that the wiring—even if no more susceptible to rodent damage than any other—is defective unless it is wrapped with rodent-deterrent tape prior to

11

sale, I agree with Judge Real's conclusion that "[p]roperly functioning wires are not rendered defective simply because rodents enjoy chewing on them. That rodent tape serves as a deterrent does not mean the wires are defective unless wrapped in tape." *Preston* 2018 WL 5099507, at *2 (C.D. Cal. May 24, 2018).

In the end, what plaintiffs are left with is evidence that their vehicles fell victim to the age-old problem that rodents like to gnaw on all kinds of things available to them, including electrical wires in parked cars. Absent any evidence that plaintiffs' vehicles were especially susceptible to this general risk *and* that Honda knew of this heightened susceptibility and intentionally failed to disclose it, plaintiffs' self-styled "fraud by omission" claim, which seeks redress under ICFA for Honda's "specific knowledge of the wiring vulnerability" in their vehicles, SJ Opp. ECF 190 at 3, n.3, cannot survive summary judgment. *See Wiegel* 946 F. Supp. 2d at 813–14 (ICFA claim based on omissions logically demands that defendants have prior knowledge of the information they allegedly concealed).

That Honda implemented a design change in certain models not at issue here based on reports that "[c]ustomers are bringing their vehicle in with the complaint that the check engine light is on, and in some rare occurrences the vehicle will not start," Def.'s L.R. 56.1 Stmt., ECF 174-1, at ¶ 109, does not alter the analysis. Such reports prompted Honda to conduct an internal

investigation in 2004, in which certain parts that had shown evidence of rodent damage were tested for "wire toughness & sheath type/design." *Id*. at ¶¶ 110-111. After laboratory tests revealed that the parts with the least rodent damage—again, not the parts at issue in this case—were insulated by a corrugated plastic sheath wrapped in rodent-deterrent tape, Honda incorporated that design into certain models. *Id*. at ¶¶ 112. Plaintiffs complain that Honda did not implement a similar design change in their vehicles, but they offer no evidence that the incidence of rodent damage in their models warranted an across-the-board design modification, nor any evidence that Honda was aware that rodent damage was a statistically significant problem in the models they drove. And in fact, Honda's expert opines without contradiction[8] that the number of complaints Honda received concerning the vehicles at issue in this case relative to the number of vehicles sold does not suggest any systemic rodent damage concern in plaintiffs' vehicle models. Def.'s L.R. 56.1 Stmt., ECF 174-1, at ¶ 127. At bottom, plaintiffs' claims are based on nothing more than anecdotal evidence—a collection of service records divorced from context and devoid of meaningful analysis—that does not,

---

[8] Plaintiffs purport to dispute Honda's factual statement on the ground that the records its expert reviewed do not account for *all* complaints concerning the vehicle models at issue. But as plaintiffs neither identify any competing universe of complaints, nor propose any way to identify the total number of complaints they deem relevant, they do not meaningfully controvert Honda's expert's analysis.

standing alone, entitle plaintiffs to a trial on the theory that Honda knew about a "defect" in their vehicles' wiring but "refus[ed] to employ countermeasures...or warn" them of the risk of rodent damage.[9]

In further retreat from the defect theories articulated in the SAC, plaintiffs argue that regardless of any defect, Honda may be held liable under the ICFA for failing to disclose the risk of rodent damage because Honda's knowledge of that risk is superior to consumers', and the risk of vehicle malfunctions caused by rodent damage was material to their purchasing decisions. On the first point, plaintiffs point out that while Honda was conducting rodent vulnerability studies to address the problem of vehicle malfunctions caused by rodent damage, none of the plaintiffs had ever "heard of rodents causing damage to vehicles" before their own vehicles were stricken. Pl.'s L.R. 56.1 Stmt., at ¶¶ 4, 15, 25. But there are several problems with plaintiffs' theory. First, while it may be that it never occurred to plaintiffs that their cars were susceptible to rodent damage, the problem of rodents gnawing on vehicle wiring is hardly one uniquely within Honda's

---

[9] Plaintiffs also cite evidence of a 2009 investigation into reports of rodents chewing on the "VTEC Solenoid Harness"—another part not at issue here—and determined that despite "many occurrences" [presumably of rodent damage], implementing a "mass-production" countermeasure was not cost-justified. *See* Pl.'s L.R. 56.1 Stmt., at ¶¶ 73-81. This evidence fails to raise a triable issue for generally the same reasons the evidence of the 2004 investigation falls short.

ken. As Honda's expert Victor Hakim observes, publicly available consumer guides have published articles with titles such as, "How to Protect Your Car From Rodents," which offer tips on how to "Avoid Attracting Critters." Hakim Rep., ECF 174-53 at 3 (featuring excerpts from a Consumer Reports publication[10]). Additionally, the damage that rats and other rodents can cause to property in general and to vehicles in particular has been reported in both local and national news media. *See, e.g., supra* notes 4-5 and accompanying text (citing recent articles).

"Under the ICFA, a statement or omission is deceptive if it creates the likelihood of deception or has the capacity to deceive. *See, e.g., Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). If other information disclosed or available to the consumer dispels any tendency to deceive, there is no deception." *Id*. at 938, 939. *Trujillo v. Apple Computer, Inc.*, 581 F. Supp. 2d 935, 938 (N.D. Ill. 2008). Given the general availability of information about the risk of rodent damage to vehicles, and absent evidence that the wiring in plaintiffs' vehicles was *especially* susceptible to such damage, no reasonable jury could find that Honda's failure to warn plaintiffs of the risk rodent damage amounted to deceptive conduct under the ICFA.

---

[10] An updated version of the Consumer Reports article is available at https://www.consumerreports.org/cars/car-maintenance/how-to-protect-your-car-from-rodents-a5816950285/ (last accessed March 26, 2024).

Second, no reasonable jury could conclude on the evidence here that Honda's failure to inform them that such damage was not covered by the NVLW, was material to their purchasing decision. The only evidence plaintiffs offer that can reasonably be construed as supporting materiality is Mr. Caracci's deposition testimony that if he had known at the time of purchase that "Honda doesn't cover rodent damage...this could potentially have been an issue, then I would have perhaps not purchased that vehicle." Caracci Dep., ECF 185-1 at 95.[11]  But as Mr. Caracci went on to testify, his job requires him to have "a reliable vehicle in order to go to and from appointments with the clients.· If I'm unable to have that, then I don't earn an income." *Id.* at 96. The only reasonable inference that can be drawn from this testimony is had Mr. Caracci not purchased the Honda, he would have purchased another car. Yet, as explained above, plaintiffs have not offered any evidence to suggest that a) the wiring in any other car Mr. Caracci would have purchased was less susceptible to rodent damage than the wiring in the Honda he did purchase; or b) that rodent damage to any other car Mr. Caracci might have purchased would have been covered by warranty. Accordingly, no reasonable jury could conclude based on Mr. Caracci's testimony that he would have

---

[11] Plaintiffs' opposition states that "[t]hey expressed that they wished they would have known (sic) about the exclusion as it could have impacted their behavior," but I have reviewed the evidence they cite for this statement and conclude that only the above-cited testimony by Mr. Caracci supports it.

made a different purchasing decision had he known the information plaintiffs fault Honda for omitting.

Moreover, courts assess the materiality of alleged omissions using "a reasonable person standard -- i.e., whether the omission concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *id.* at 939, Naturally, consumers such as plaintiffs, who have already incurred a loss, are likely to feel that they would have done something differently at the time of purchase to avoid the damage. But to evaluate objectively how a reasonable consumer would behave at that time, when the loss is merely a risk rather than a *fait accompli*, a fact-finder must consider, at a minimum, how likely that risk is to materialize. Plaintiffs' evidence does not allow a jury to consider that question. Plaintiffs state that Honda produced "over 3000 complaint records related to rodent damage," but they offer no context for this number. Does each of these complaint records relate to a unique incident of rodent damage, or do incidents of rodent damage typically generate multiple complaint records? Does each complaint record relate to a unique vehicle, or do some vehicles (such as Ms. Turgeon's) suffer multiple incidents of rodent damage, generating multiple records? Perhaps most importantly, how does the number of complaint records compare to the total number of Honda vehicles on the road in any given period, and how does that ratio compare to the rate at which

other vehicles the consumer might have purchased suffer rodent damage? Without any evidence to answer questions such as these, the fact-finder cannot evaluate how a reasonable consumer would weigh the risk that her vehicle might suffer rodent damage that would not be covered by warranty.

The foregoing discussion explains why plaintiffs are not entitled to a trial on their deception claim under the ICFA. Their claim of unfairness requires only brief additional comment. The so-called "*Sperry* factors," derived from *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972), guide the analysis on whether a given practice is unfair under the ICFA. They "ask whether the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. *Batson v. Live Nation Ent., Inc.,* 746 F.3d 827, 830 (7th Cir. 2014). Plaintiff argues that Honda's conduct satisfies the third criterion "because sudden loss of power steering resulting from rodent damage presents a safety issue on the roadway and [Honda] provides no warning of the latent defect." For reasons discussed above, the evidence does not substantiate plaintiffs' claim of "defect." And while it is reasonable to believe that a "sudden loss of power steering" could, in some contexts, result in a serious accident, none of the plaintiffs suffered any kind of accident as a result of the rodent damage to their vehicles, nor do they point to any evidence suggesting that

anyone has suffered such an accident due to rodent damage.[12] Accordingly, plaintiffs argument that Honda's conduct is unfair because it causes substantial injury to consumers is too speculative to warrant a trial of their ICFA unfairness claim.

Plaintiffs' express and implied warranty claims similarly merit only brief analysis. All agree that to withstand summary judgment of their claim for breach of express warranty, plaintiffs must identify evidence from which a jury could conclude that their vehicle malfunctions were caused by a defect in the vehicles' materials or workmanship. As explained above, plaintiffs have failed to uncover any admissible evidence of the soy-based defect alleged in their complaints. Indeed, plaintiffs concede that their claims are not based on the presence or absence of any particular ingredient in their vehicles' wiring insulation. The "defect" they now identify—that their volehicle's wiring could not "withstand"

---

[12] Moreover, plaintiffs play a bit fast and loose with the evidence on this front. For example, they assert that Honda was aware that rodent damage could cause so-called "A-Rank issues," i.e., safety concerns, including "having power steering fail and the steering wheel lock up while driving on a highway." Pl.'s L.R. 56.1 Stmt., ECF 185 at ¶ 42 (citing Golding Dep., ECF 218-6, at 272-275). But the cited evidence does not indicate that rodent damage caused a "steering wheel lock up." In the cited testimony, Mr. Golding, Honda's manager of automobile warranty operations, states, "after reading the entire paragraph of this story, it sounds like the steering wheel lock up as described is not an actual, complete steering wheel lock up. It's a stiffening of the steering based on what I'm reading in the entirety of the paragraph because the customer was able to drive the car." Accordingly, it does not show, as plaintiffs suggest, that Honda "is aware" that rodents "have caused" incidents in which the steering wheel "lock[ed] up while driving on a highway."

rodent gnawing without the use of Rodent Tape—simply does not describe a defect in materials or workmanship, but rather repackages their challenge to Honda's design decision to apply rodent tape pre-sale in only certain models. As defendants observe, Illinois law distinguishes between claims based on design defects and those based on defects in materials or workmanship. *See Hasek v. DaimlerChrysler Corp.,* 319 Ill. App. 3d 780, 790, 745 N.E.2d 627, 635 (2001). *See also Bruce Martin Const., Inc. v. CTB, Inc.,* 735 F.3d 750, 753 (8th Cir. 2013) ("[D]efects in material and workmanship refer to departures from a product's intended design while design defects refer to the inadequacy of the design itself." (interpreting Indiana law).

The theory on which plaintiffs now rely is clearly in the nature of a design defect. Accordingly, I need not reach the NVLW's exclusion for "Acts of Nature." Because the damage to plaintiffs' vehicles was not caused by defects in materials or workmanship, it did not trigger Honda's repair-or-replace obligations under the terms of the NWLV in the first instance. None of the cases plaintiffs cite supports a contrary conclusion.

This leaves only plaintiffs' claim for breach of the Magnusson-Moss Warranty Act, which "imposes on manufacturers the same implied warranties that state law imposes on the buyer's immediate seller." *Alvarez v. Am. Isuzu Motors*, 749 N.E.2d 16, 22 (2001) (citing *Cosman v. Ford Motor Co.*, 674 N.E.2d 61, 64 (1996).

20

Accordingly, a jury can find in plaintiffs' favor if it concludes that their vehicles were not "fit for the ordinary purposes for which such goods are used." 810 ILCS 5/2-314(2)(c). At bottom, this claim, too, relies on the ultimately unsubstantiated premise that the wiring in plaintiffs' vehicles was "defective." *See Oggi Trattoria & Caffe, Ltd. v. Isuzu Motors Am., Inc.*, 865 N.E.2d 334, 341 (2007) ("[w]ith regard to automobiles, fitness for the ordinary purpose of driving implies that the vehicle should be in a safe condition and substantially free of defects") (citations, internal quotation marks, and alterations omitted). What the evidence in this case shows is that the wiring in plaintiffs' vehicles, like many other components of many electronic and industrial items, was *vulnerable* to rodent damage. The notion of "defect," however, implies that the wiring in their cars departed from some ascertainable standard or norm. For example, if some feature of their vehicles' wiring made it *especially* susceptible to rodent damage as compared to other vehicles, a jury could reasonably conclude that the wiring was defective. Or indeed, if Honda failed to incorporate available, rodent-deterrent design elements commensurate with the level of risk that rodent damage presents to consumers, a jury could reasonably conclude that its design was defective. But plaintiffs' vehicles were not "defective" simply because they suffered rodent damage, nor does

the record suggest that their vehicles were so unsafe to drive as to be unfit for their ordinary purpose.

III.

For the foregoing reasons, defendants' motion for summary judgment is granted. All other pending motions are terminated.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 27, 2024